RELIABLE STEEL FABRICATORS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reliable Steel Fabricators v. Commissioner
Docket No. 7687-93
United States Tax Court
T.C. Memo 1995-293; 1995 Tax Ct. Memo LEXIS 295; 69 T.C.M. (CCH) 3051; June 28, 1995, Filed *295 Decision will be entered for respondent. J. Patrick Quinn, for petitioner. Robert S. Scarbrough, for respondent. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for petitioner's taxable year beginning April 1, 1989, and ending December 31, 1989, in the amount of $ 19,987. The issue for decision is whether petitioner is liable for built-in gains tax under section 1374 [1] and eligible for the corresponding deduction relating to unfinished inventory on the date of petitioner's conversion to an S corporation and, if so, the proper amounts thereof. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, petitioner maintained a legal residence in Olympia, *296 Washington. Petitioner was incorporated on January 24, 1974, as a C corporation. On December 14, 1988, petitioner elected S corporation status, effective April 1, 1989. Petitioner on or about March 2, 1990, filed a Form 1120S, U.S. Income Tax Return for an S Corporation, for the year beginning April 1, 1989, and ending December 31, 1989. Petitioner manufactured specialty containers, metal tanks, and machinery for its customers. Many of the tanks and containers manufactured by petitioner were built to customer specifications, and these tanks and containers were subject to customer approval or rejection. Petitioner manufactured two types of tanks, "field tanks" and "inventory tanks". "Field tanks" were tanks built on the customer's property on which the tanks were to be used by the customer. Petitioner used subcontractors on these contracts. Field tank customers were billed, and the customers made payments to petitioner on an interim basis. Prior to making payment, petitioner's customers for field tanks approved the work covered by the billings. Inventory tanks were built for petitioner's inventory and were generally built to meet the specifications of frequently requested products. *297 Therefore, a customer would not be identified at the time an inventory tank manufacture began. Generally, customers were billed at the completion and approval of products, except in the instance of field tanks where interim payments were received, and in the instance of inventory tanks which may not have had a customer at the time the tank was completed. On the effective date of petitioner's election for S corporation status, petitioner had a number of projects that were incomplete in its work-in-process inventory. Some of these projects were completed and either paid for or, in the case of inventory tanks, sold before the end of the year 1989. Petitioner on its Federal tax return for the period April 1 through December 31, 1989, did not report any built-in gains tax. Respondent determined a built-in gains tax in the amount of $ 19,987 for petitioner's taxable year April 1 through December 31, 1989. This amount was calculated from petitioner's work-in-process inventory which was completed and sold by petitioner before December 31, 1989. Respondent determined that the amount of built-in gains totaled $ 58,785 and the tax on the amount was imposed at a rate of 34 percent. Respondent *298 calculated the profit to be allocated to petitioner's work-in-process inventory sold before December 31, 1989, by subtracting the estimated total cost of each project from the sale price and multiplying this estimated total profit on each item by the percentage of completion of that item at March 31, 1989. Respondent calculated the percentage of completion by dividing the cost incurred up to March 31, 1989, of each unfinished project by the estimated total cost for that project. Respondent at trial put in evidence a revised computation of tax which shows an increase in tax due from petitioner over the amount determined in the notice of deficiency, but respondent does not claim an increased deficiency. OPINION Section 1374 [2] imposes a corporate level tax on the net recognized built-in gains for an S corporation which has converted from a C corporation to S corporation status. Section 1374 applies to all built-in gain property held by a C corporation at the time its election to be an S corporation becomes effective. The gain is recognized when the built-in gain property is sold by the corporation during the recognition period, which is the 10-year period after S status begins. Recognized *299 built-in gain is defined as any gain recognized on the disposition of any asset except to the extent that the S corporation establishes that such gain exceeds the excess of the fair market value of the asset of the S corporation as of the beginning of its first tax year covered by an S election over the adjusted basis of the asset at such time. Sec. 1374(d)(3). Section 1.1374-7(a), Proposed Income Tax Regs., 57 Fed. Reg. 57978 (Dec. 8, 1992), states that the fair market value of the inventory of an S corporation on the first day of the recognition period equals the amount that a willing buyer would pay a willing seller for the inventory in a purchase of all the S corporation's assets by a buyer that expects to continue to operate the S corporation's business. While this regulation was not promulgated at the date of the filing of petitioner's 1989 return, it was accepted on brief by both parties as an appropriate way of determining fair market value for work-in-process inventory. *300 Fair market value is a question of fact to be determined by examining the entire record. Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Petitioner contends that respondent erred in valuing its work-in-process inventory by including a profit on the costs expended for the partial completion of the item rather than at its cost or scrap value. Petitioner contends that fair market value of the work-in-process inventory would not include an allocation of profit to the percentage of completion. Respondent contends that petitioner's work-in-process inventory should be valued by allocating the profit allocable to the percentage of completion. Respondent's method of valuation allocates the full sale price on the basis of percentage of completion, which in effect values petitioner's work-in-process inventory at its full value. In support of its position that the work-in-process inventory on the first date of the recognition period should be valued at its replacement cost or, in the alternative, its scrap value, petitioner relies on two cases, Fame Tool & Manufacturing Co. v. Commissioner, 334 F. Supp. 23 (S.D. Ohio 1971), *301 and Frank G. Wikstrom & Sons, Inc. v. Commissioner, 20 T.C. 359 (1953). In Fame Tool, the taxpayer manufactured tools and dies to order. The taxpayer did not maintain a finished inventory, but had a substantial amount of work-in-process inventory. The taxpayer was required to scrap any order rejected by the customer. The taxpayer did not include its work-in-process inventory in its closing inventory, but included only the cost of materials of the work in process without accruing labor and overhead costs. The court held that this method was not a generally accepted accounting procedure and did not clearly reflect the taxpayer's income. The court upheld the Commissioner's adjustment to the taxpayer's inventory method that included, in addition to the cost of raw materials and supplies entered into or consumed in connection with the product, expenditures for direct labor and indirect expenses incident to and necessary for the production of the particular item of inventory pursuant to section 1.471-3(c), Income Tax Regs.Fame Tool & Manufacturing Co. v. Commissioner, supra at 30-31. In Frank G. Wikstrom & Sons, Inc. v. Commissioner, supra, *302 the taxpayer was in the business of designing, fabricating, modifying, servicing, and repairing machinery exclusively on special contract. The taxpayer's inventory method included the use of inventories valued at cost. The costs used by the taxpayer included as costs of production only direct labor and material charges attributable to specific contracts. All other expenses incurred by the taxpayer were treated as general expenses and deducted as operating expenses in the year incurred. The Commissioner recomputed the taxpayer's closing inventories by allocating to each of the years in issue a portion of the total overhead expenses based on the relation of the number of production hours of each year represented in the closing inventories of that year to the total production hours of that year. We upheld the Commissioner's redetermination based on the clear import of the regulations and dismissed arguments made by the taxpayer which were based on the premise that inventory of a customized nature should be valued differently than standard inventories. In both of these cases, the principal issue was the proper method for accounting for inventories under section 471, where taxpayers are *303 required to maintain an inventory practice that is consistent from year to year. Greater weight is to be given to consistency than to any particular method or basis of inventory valuation. Sec. 1.471-2(b), Income Tax Regs. While the method of valuing inventory approved by the courts in Fame Tool and Wikstrom did not allocate gross profit to the work-in-process inventory, the valuation was not one arriving at fair market value, but rather at an inventory method consistently reflecting income. See Knapp King-Size Corp. v. United States, 208 Ct. Cl. 533, 527 F.2d 1392, 1400 (1975), in which the court concluded that the willing buyer/willing seller standard of determining fair market value is inconsistent with valuation of inventories under section 471. Neither the Fame Tool nor the Wikstrom case addressed the issue of whether profit is included in valuing inventory under a willing buyer/willing seller standard. We find, little, if any, relevance to the issues before us in the holdings of the Fame Tool and Wikstrom cases. Neither of those cases addressed the correct method for determining fair market value of work-in-process *304 inventory, and therefore any argument based on those cases is of little value. Though we are aware of no cases dealing with the fair market value for a built-in gains determination with respect to work-in-process inventory, courts have applied the standard of what a willing buyer would pay a willing seller for work-in-process inventory in similar contexts. In Jack Daniel Distillery v. United States, 108 Ct. Cl. 308, 379 F.2d 569 (1967), the taxpayer acquired the stock of and liquidated its predecessor corporation. It thereafter carried on the predecessor's distillery business. Under section 334(b)(2), if property is received in complete liquidation of a subsidiary and certain other criteria are met, the adjusted basis of the property received is the adjusted basis of the stock with respect to which the distribution was made. The adjusted basis of such stock is to be allocated among the tangible and intangible assets received in proportion to the net fair market value of the assets received pursuant to section 1.334-1(c)(4)(viii), Income Tax Regs. The court held that for purposes of valuing the inventory of the taxpayer under a willing *305 buyer/willing seller standard, fair market value is predicated in part on the highest and best use which can be made of the subject property. Jack Daniel Distillery v. United States, supra at 576. The court accepted the taxpayer's determination of fair market value of the unbottled inventory, which was computed by utilizing profit projections made by the taxpayer's auditors. In determining fair market value, the court stated: The fair market value test is predicated in part on the highest and best use which can be made of the subject matter * * *. In assessing fair market value, due consideration should be given to the realities of commercial transactions, and particularly to the plain facts concerning the best use to be made of the subject matter of a sale. As a recognized commentator in the tax field has said: "Fair market value in essence means sound value; it is the price for which the owner would hold out if he could." * * * [Fn. ref. omitted.]
Jack Daniel Distillery v. United States, supra at 576. In Knapp King-Size Corp. v. United States, supra, the taxpayer purchased all of the outstanding stock of *306 King-Size Inc. (King-Size), and thereafter liquidated King-Size, taking over all of its assets in its own name. King-Size was exclusively a retail distributor of men's apparel and accessories, with 92 percent of its products being sold by mail order. It was the sole national mail-order distributor dealing exclusively in wearing apparel and accessories for men who were above average in height and weight. In rejecting the Government's argument that the willing buyer/willing seller standard is predicated on the retail price of the inventory, the court stated: a willing buyer would not be agreeable to paying the full retail price if he knew that he must incur a loss because there had been no allowance for his cost of disposition. Nor would he be willing to pay a price that would merely return his investment without compensating him for the risks which he must incur during the time it took to make the retail sale and for his loss of opportunity to make profits in other ways during the same period on the amount of his investment. Conversely, the willing seller of inventory for a lump sum could hardly expect to receive as much as the aggregate retail price if he was thereby enabled to *307 shift the burden of the disposition costs and risks which would exist during the period of retail sale and if he could invest the proceeds in equally profitable investments or activities elsewhere.
Knapp King-Size Corp. v. United States, supra at 1402. In the Knapp King-Size Corp. case the court estimated that the profit would be allocated between the willing buyer and willing seller in order for the buyer to maintain a profit on its resale in the retail market. The court concluded its analysis by stating that fair market value is essentially a factual question. Knapp King-Size Corp. v. United States, supra at 1405. In Zeropack Co. v. Commissioner, T.C. Memo. 1983-652, affd. without published opinion (4th Cir. Aug. 29, 1985), this Court determined the fair market value of inventory on a sale of a going concern. The taxpayer purchased a frozen fruit manufacturing and distributing company. This Court decided the fair market value of inventory acquired in a lump-sum purchase in order to properly allocate the purchase cost to inventory, goodwill, and other assets acquired in the purchase. In calculating the value, the taxpayer *308 valued the inventory at prices which could be realized for the fruit in sales to customers in the ordinary course of business. The Commissioner rejected this analysis and instead relied on a witness, who determined fair market value at less than the sales price of the inventory, but greater than cost. The Commissioner's witness stated that no knowledgeable purchaser in a bulk sale would pay the seller the retail value of the inventory. This Court decided for the Commissioner, stating: The approach used by respondent's witness is a reasonable one. Any purchaser in bulk would definitely consider how much he could sell the purchased inventory for and the amount of expenses he would incur in selling the inventory. Undoubtedly, the projected sales and projected expenses would be the primary factors in any decision as to the amount to pay for the bulk inventory. * * * [Zeropack Co. v. Commissioner, supra.]
Though we are aware of factual distinctions between the instant case and the above-cited cases, [3] it is clear that in determining what a willing buyer would pay a willing seller for its work in process, Jack Daniel Distillery v. United States, supra, *309 Knapp King-Size Corp. v. United States, supra, and Zeropack Co. v. Commissioner, supra, rely on the proposition that some amount of profit is included in the purchase price. The court in each instance decided that the fair market value was lower than full retail price but higher than the cost since the seller would require some profit. These holdings were based on a finding that a willing buyer would not be willing to forgo all profits inherent in the inventory and a willing seller would not forgo all profit inherent in the work in process, since the manufacturing process has attached a value to the inventory greater than the materials themselves.
We, therefore, reject petitioner's contention that, as *310 a matter of law, the fair market value of work-in-process inventory is equivalent to replacement cost, since this method allocates no profit to the seller. We further reject petitioner's alternative valuation at scrap value, since petitioner offered no evidence as to why the valuation of petitioner's inventory at scrap value would be appropriate or equal to or less than cost. Jack Daniel Distillery v. United States, Knapp King-Size Corp. v. United States, and Zeropack Co. v. Commissioner, each holds that a discount from full retail price on the profit attributed to the seller is appropriate. Petitioner in the instant case has offered no evidence from which we could reach a conclusion as to the proper amount, if any, of a discount from full sale price. Petitioner relies entirely on the stipulated facts, which contain no fact as to fair market value of the work-in-process inventory. The only evidence before us apart from the stipulated facts is the testimony of an internal revenue agent who prepared a worksheet allocating profit, and the worksheet accompanied by the ledger entries of petitioner and bills of petitioner on which the worksheet is based. There was no evidence *311 offered by petitioner as to the resale value for unfinished industrial tanks, of the percentage of contracts that were accepted by petitioner's customers, or of the nature of the contracts between petitioner and its customers. Petitioner offered no testimony, expert or otherwise, as to the valuation of its work-in-process inventory. There is simply no evidence in the record for this Court to make an adequate valuation of a proper discount, if any, from full retail price allocable to petitioner's work-in-process inventory. However, based on the reasoning of the opinions in the cases cited herein, we would be unwilling to conclude that no discount from full retail sale price is appropriate for work-in-processs inventory. The schedule prepared by respondent's witness, which was well substantiated, contained a computation showing that in fact the total sale price used in the notice of deficiency was less than full retail sale price, or stated in a different way, showed that a discount from full retail sale price for work-in-process inventory had been allowed in respondent's computation in the notice of deficiency. Respondent claimed no increased deficiency based on the schedules testified *312 to by her witness. Therefore, in effect, there is a discount from full retail sale price allowed in respondent's determination in the notice of deficiency, and petitioner has not shown such discount to be inappropriate. [4]
It has long been the holding of this Court that the Commissioner's determination is presumed correct, and the burden is on the taxpayer to show error in such determination. We do not accept petitioner's contention that as a matter of law work-in-process inventory is valued at replacement *313 cost for purposes of section 1374. Since petitioner has offered no evidence from which we could make a reasonable calculation of fair market value other than the value determined by respondent, under the legal standards discussed above, we sustain respondent's determination set forth in the notice of deficiency. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. SEC. 1374(a). General Rule. -- If for any taxable year beginning in the recognition period an S corporation has a net recognized built-in gain, there is hereby imposed a tax (computed under subsection (b)) on the income of such corporation for such taxable year. (b) Amount of Tax -- (1) In General. -- The amount of the tax imposed by subsection (a) shall be computed by applying the highest rate of tax specified in section 11(b) to the net recognized built-in gain of the S corporation for the taxable year. * * * (d)(3) Recognized built-in gain. -- The term "recognized built-in gain" means any gain recognized during the recognition period on the disposition of any asset except to the extent that the S corporation establishes that -- (A) such asset was not held by the S corporation as of the beginning of the 1st taxable year for which it was an S corporation, or, (B) such gain exceeds the excess (if any) of -- (i) the fair market value of such asset as of the beginning of such 1st taxable year, over (ii) the adjusted basis of the asset as of such time. * * *
(7) Recognition period. -- The term "recognition period" means the 10-year period beginning with the 1st day of the 1st taxable year for which the corporation was an S corporation.↩
3. In both its brief and reply brief, petitioner attempts to draw distinctions between the instant case and the above-cited cases. However, petitioner for the most part argues distinctions that are simply not evidenced by the record.↩
4. The computation made by respondent's witness based on petitioner's records shows built-in gain at Apr. 1, 1989, based on the percentage of the full selling price of the items in petitioner's work-in-process inventory that the costs expended bear to total costs of $ 65,332. The built-in gain of the work-in-process inventory determined in the notice of deficiency is $ 58,785. Therefore, the amount in the notice of deficiency reflects a discount of over 10 percent from full sale price of the work-in-process inventory.↩